THE METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, Plaintiff-Appellee, *v.* UNITED STATES STEEL CORPORATION, Defendant-Appellant.

(No. 61503;

First District (1st Division)—June 26, 1975.

*Rehearing denied July 14, 1975.*

Hackbert, Rooks, Pitts, Fullagar and Poust, of Chicago (Jay A. Lipe, James T. Harrington, and William M. Stevens, of counsel), for appellant.

Allen S. Lavin and Phillip Rothenberg, of Chicago (Leonard M. Ring and Ralph L. Brill, of counsel), for appellee.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

This record brings before us proceedings brought by the Metropolitan Sanitary District of Greater Chicago (plaintiff) against United States Steel Corporation (defendant) concerned with pollution of the water of Lake Michigan by the defendant. Defendant made a motion in the trial court to dismiss or alternatively to stay the proceedings. Upon denial of the motion, defendant filed an interlocutory appeal. Supreme Court Rule 307, Ill. Rev. Stat. 1973, ch. 110A, R. 307.

██ Our first concern was a determination of the jurisdiction of this court to hear an interlocutory appeal from the order denying a stay of the proceedings. (*In re Organization of Fox Valley Community Airport Authority*, 23 Ill.App.3d 168, 318 N.E.2d 496.) Special memoranda upon this point prepared and furnished at our request by able counsel for both sides have convinced us that we do have jurisdiction for determination of this interlocutory appeal. *Bohn Aluminum & Brass Co. v. Barker*, 55 Ill.2d 177, 180, 181, 303 N.E.2d 1.

In this court defendant contends generally that the trial court should have stayed the action pending completion of administrative proceedings before the United States Environmental Protection Agency which allegedly involve the same subject matter and issues and require the resolu-

tion of identical factual questions. This contention is based upon the doctrines of primary jurisdiction and exhaustion of administrative remedies. In response, plaintiff takes the position that these doctrines are not applicable here and may not defeat the power of the trial court to hear and fully resolve a nuisance action without resorting to prior hearings before the Federal administrative agency.

The present proceedings commenced with the filing of plaintiff's complaint predicated upon the Illinois statute giving plaintiff specific power and authority to prevent pollution of any waters from which a water supply may be obtained by any city, town or village within the District. (Ill. Rev. Stat. 1973, ch. 42, par. 326aa.) The theory expressed in plaintiff's complaint is that the operations conducted by defendant in the manufacturing and processing of steel and steel products at the southern end of Lake Michigan in close proximity to Gary, Indiana, use noxious chemical substances and fluids which severely and grossly contaminate the effluents that are discharged by the plant either directly into Lake Michigan or into the Grand Calumet River which flows into the lake. Plaintiff also alleged that as a result the water at the southern end of Lake Michigan has been severely fouled and polluted to the injury and detriment of the water quality and ecology of the lake, thus causing grave danger and immediate threat to the health and safety of the population within plaintiff District. The complaint prayed an injunction restraining the continuation of this pollution. It is also plaintiff's theory, as expressed in its brief, that plaintiff is acting in accordance with common-law principles to enjoin pollution of public water supplies which constitutes a common-law nuisance.

Defendant filed a supplementary motion verified by affidavit seeking to dismiss or alternatively to stay the proceedings. This motion set forth that on October 31, 1974, a permit had been issued to defendant under the National Pollutant Discharge Elimination System. On November 18, 1974, a request was filed by defendant with the United States Environmental Protection Agency for an adjudicatory hearing with respect to said permit.

The motion further recited that plaintiff was authorized to join and participate in said adjudicatory hearing. It alleged that the Federal agency is required to make the same factual determinations, involving complex and intricate scientific, technological and economic questions, as were presented to the trial court in this cause. It alleged that the problem of the water quality of Lake Michigan involves hundreds of persons and entities and therefore coordinated and coherent solutions were required. It was, therefore, urged that the trial court should invoke the

primary jurisdiction of the Federal agency and require plaintiff to exhaust its administrative remedies.

Exhaustive briefs were filed by the parties in the trial court, including the citation of numerous legal authorities. Among other matters a copy of the Federal permit issued by the Environmental Protection Agency is appended to defendant's material. The permit is a 58-page document setting forth effluent limitations, monitoring requirements and numerous other detailed and highly technical conditions referring to discharges by defendant from its facility in Gary, Indiana, into the Grand Calumet River and Lake Michigan.

After hearing oral argument, the trial court entered an order describing the impending adjudicatory hearing upon the administrative permit and finding that the pendency of this hearing did not require a stay or dismissal of plaintiff's action by reason of the doctrines of primary jurisdiction or exhaustion of remedies and that denial of defendant's motion for stay or dismissal would not violate its rights to due process of law or other specified legal principles. The order also recited the pendency of similar proceedings against defendant brought by the United States of America in the United States District Court for the Northern District of Indiana, Hammond Division, and by the State of Illinois in the circuit court of Cook County, both of which charge defendant with discharging pollutants and contaminants into water adjacent to its Gary operation which allegedly reach Illinois waters within the jurisdiction of the State of Illinois, and of the plaintiff in the instant case. The order further found that plaintiff was entitled to maintain its action for injunction as filed which sought to enjoin a common-law nuisance or a nuisance under statutory description. (Ill. Rev. Stat. 1973, ch. 42, pars. 326 and 326aa.) The court accordingly denied defendant's motion to stay or alternatively to dismiss the action.

For the sake of completeness, we note that in this same order the trial court certified the existence of certain issues of law raised in the cause concerning which there was substantial ground for difference of opinion and that an immediate appeal concerning the same might materially advance the ultimate termination of the litigation. Supreme Court Rule 308, Ill. Rev. Stat. 1973, ch. 110A, R. 308.

On February 7, 1974, defendant filed in this court an application for leave to appeal pursuant to Rule 308. (General No. 61457.) This application was later amended; objections thereto were filed by plaintiff and defendant replied to these objections. The fifth division of this court granted defendant's motion for oral argument on this application which was heard on March 25, 1975. On that date, after full consideration of

the pleadings, memoranda and argument, the amended application for leave to appeal from the interlocutory order was denied by the fifth division of this court.

Turning now to the merits of the appeal before us, it is first necessary to consider the background of the pending Federal administrative proceedings. In October of 1972, the Congress of the United States passed the "Federal Water Pollution Control Act Amendments of 1972." (92 Congress, Public Act 92—500, 33 U.S.C.A. §§ 1251 *et seq.* (1975 Supp.), 86 Stat. 816 (1972).) This Act recites in section 1251 thereof the laudable objective of Congress "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." (33 U.S.C.A. § 1251(a) (1975 Supp.).) This lengthy piece of legislation makes illegal the discharge of any pollutant by any person except in compliance with the Act. The Act requires limitations upon discharge of effluents no later than July 1, 1977, in accordance with the "application of the best practicable control technology currently available * * *." Not later than July 1, 1983, discharges are to be regulated and limited by "the best available technology economically achievable * * * which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants * * *." 33 U.S.C.A. § 1311(b)(1)(A), (b)(2)(A) (1975 Supp.).

As pointed out by defendant, this legislation contains water quality related effluent limitations, water quality standards and implementation plans, information and guidelines on water quality criteria and effluent limitations, provision for a water quality inventory to be presented to Congress, national standards of performance for control of the discharge of pollutants, toxic and pretreatment effluent standards to be published by the Administrator (the Administrator of the Environmental Protection Agency), and provision for inspections and monitoring as regards industrial compliance. (See 33 U.S.C.A. §§ 1312-1318 inclusive (1975 Supp.).) The Act also contains sanctions of various types for enforcement.

The Act also establishes the National Pollutant Discharge Elimination System. (33 U.S.C.A. § 1342 (1975 Supp.).) Commencing January 1, 1975, a permit from the Administrator is required for every industrial discharge into the waters of the United States. As authorized by Congress, the Administrator has established procedures for issuance of the permits and administration of the program thereunder. (See 40 C.F.R. part 125 and following (1974).) Within 10 days after such permit has been issued, an adjudicatory hearing may be requested. Such hearing may be granted by the Administrator and will be held pursuant to public notice. Interested persons may request joinder as parties to the hearing

so that they may have a voice as to the conditions and limitations of the permit.

The next stage is the holding of a prehearing conference before an administrative law judge for definition of the issues and then for hearing. If provisions of the permit are disputed, a record is made and this, together with recommendations, is presented by the administrative judge to the regional administrator. Ten days after regional decision has been rendered, an appeal may be had to the Administrator. Thereafter the aggrieved party may appeal to the United States Court of Appeals for the district in which he resides.

Defendant asserts in its brief, and it is agreed by the parties, that a permit has been issued to defendant by the Environmental Protection Agency as above described. This lengthy document imposes limitations upon operation of defendant's plant regarding discharge of industrial wastes into Lake Michigan and the Grand Calumet River. In 1977, these limitations will be made more stringent for the permitee. Discharge of 15 various substances, chemicals and minerals, are regulated by the conditions of this permit together with volume and temperature of water discharged.

Defendant further asserts, and it is undenied and apparently undisputed, that, after the issuance of the permit, defendant filed a timely request for an adjudicatory hearing. The Administrator granted this request, and public notice of hearing has been issued. The State of Indiana and the city of Chicago have both joined in the adjudicatory proceedings as parties. It appears from an appendix to defendant's brief that the State of Illinois, acting through the Illinois Environmental Protection Agency (established under the authority of Ill. Rev. Stat. 1973, ch. 111½, par. 1001 and following) has filed a motion for intervention as a party to the adjudicatory hearing. It is also asserted in defendant's brief that a prehearing conference has been scheduled before an administrative law judge on April 16, 1975, to define the issues and set the matter for hearing. This is pursuant to statutory provisions as above summarized to determine the rights of the parties concerning the limitations expressed in the permit and the merits thereof.

■■ Let us turn next to the legal background of the proceedings before us. Plaintiff's complaint is specifically predicated upon statutory authority. (Ill. Rev. Stat. 1973, ch. 42, pars. 326, 326aa and 326bb.) Section 7aa of "An Act to create sanitary districts * * *" (par. 326aa) provides generally that plaintiff has the "power and authority to prevent the pollution of any waters from which a water supply may be obtained by any city, town or village within the district." This action may be commenced in

the circuit court of the county in which the district is located. Section 7bb (par. 326bb) contains pertinent definitions. It defines "pollution" as follows:

> "The term 'Pollution' means such alteration of the physical, thermal, chemical, biological or radioactive properties of any waters of the State, or such discharge of any contaminant into any waters as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate uses, or to livestock, wild animals, birds, fish, or other aquatic life."

This very statute was considered by the Supreme Court of Illinois in litigation between the same parties now before us. (*Metropolitan Sanitary District v. United States Steel Corp.*, 41 Ill.2d 440, 243 N.E.2d 249.) On direct appeal from the circuit court, the supreme court affirmed a temporary injunction restraining defendant from polluting the waters of Lake Michigan by discharge of oil. The court pointed out that plaintiff had statutory authority to prevent pollution of any waters from which a water supply may be obtained by any city, town or village within the district. Thus, the statutory power of plaintiff to seek injunctional relief by nuisance abatement against pollution of water supply has been confirmed with complete finality.

However, the creation of this statutory authority should not be viewed as a new or radical innovation in the law of Illinois. In fact, the right of an individual or a municipality to apply to a court of chancery for injunctional relief against pollution of a water supply and the rendition of such relief by the court has been recognized for many years. In *Ruth v. Aurora Sanitary District*, 17 Ill.2d 11, 158 N.E.2d 601, the supreme court affirmed an injunction ordering trustees of a municipality to abate a nuisance caused by discharge of sewage into a water supply source. This injunction had been obtained by a private individual and the court referred to the action as "abatement of a public nuisance." (17 Ill.2d 11, 17.) To illustrate the venerable age of this principle, we note that the court cited *Green v. Oakes*, 17 Ill. 249. There, in 1855, the supreme court reversed a decree dismissing a suit seeking to prevent obstruction of a public way. The court referred to this as a nuisance and a wrong or invasion of the common right. Another instance of the recognition of the propriety of injunctional relief to restrain the pollution of a water supply is *City of Northlake v. City of Elmhurst*, 41 Ill.App.2d 190, 190 N.E.2d 375, citing *Barrington Hills Country Club v. Village of Barrington*, 357 Ill. 11, 191 N.E. 239, and other authorities. The court pointed out that equity and law had concurrent jurisdiction in dealing with the abate-

ment of a nuisance and that neither a natural person nor a municipal corporation has an inherent right to use a natural water course for disposal of sewage and waste water. 41 Ill.App.2d 190, 197, 198.

■■ As above shown, the point principally advanced by defendant is that the theory of primary jurisdiction requires that these proceedings be stayed. This theory is most ably expounded in 3 Davis, Administrative Law Treatise § 19.01 et seq. (1958). From the pen of the text writer we learn that primary jurisdiction is a creature of the courts. In its application, the court will refrain from exercising its own jurisdiction "until after an administrative agency has determined some question or some aspect of some question arising in the proceeding before the court." 3 Davis 3.

Perhaps the initial case in which the doctrine is brought forth is *Texas & Pacific Ry. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 51 L.Ed. 553, 27 S.Ct. 350. There, a shipper sued the railroad to recover allegedly excess charges on the theory that the rate charged by the carrier was unreasonable and discriminatory. Although jurisdiction in this type of case had traditionally been exercised by the courts, it was held that the matter should first proceed before the Interstate Commerce Commission. The court pointed out that uniformity was essential in shipping rates so that the matter should not be left to determination by courts and juries. (See 204 U.S. 426, 439, 440.) The court held, in effect, that action by the courts would be "wholly inconsistent with the administrative power conferred upon the Commission, and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed." See 204 U.S. 426, 441.

In the opinion of the text writer, possibly the best judicial statement of primary jurisdiction is contained in *Far East Conference v. United States,* 342 U.S. 570, 574, 96 L.Ed. 576, 72 S.Ct. 492. As shown in that case, the doctrine does not require complete withdrawal by the court. The essential is that the administrative agency should be permitted first or primarily to examine the situation so that in handling intricate facts the court may have the benefit of the specialized expertise which presumably will be brought to bear upon the situation by the administrative agency. The doctrine does not oust the court from jurisdiction but merely delays the exercise of power by the court. After having had the benefit of expert initial determination by the administrative agency, the court may proceed to final judgment.

■■ Counsel before us have cited numerous decisions by the United States Supreme Court and other authorities. It is unnecessary to review all of these cases as there is no dispute between the parties regarding the existence of the doctrine or its definition. The problem lies in a determination of its applicability to the case before us. An additional factor

requires consideration. It is undoubtedly correct, as counsel for plaintiff urge, that Congress has constantly recognized and attempted to preserve the inherent right of state and local governments to protect the water supply of their citizens from industrial and other pollution. Congress has declared and described its policy "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce and eliminate pollution * * *." (See 33 U.S.C.A. § 1251 (1975 Supp.).) Congress has made appropriations to States and interstate agencies to help defray the cost of establishing and maintaining adequate measures for prevention and control of water pollution. 33 U.S.C.A. § 1256(a) (1975 Supp.).

We find strong concern expressed by Congress for perpetuation and encouragement of the rights of States and municipalities to prevent pollution of the water supply of their citizens in the Federal legislation added in October 1972, upon which the pending adjudicatory hearing on the permit issued to defendant is based. We have already noted the recital in this current legislation of the policy of Congress "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution * * *." (33 U.S.C.A. § 1251(b) (1975 Supp.).) The use of the word "primary" is of special force and significance.

The new legislation also specifies that it shall not "restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation * * *." (33 U.S.C.A. § 1365(e) (1975 Supp.).) In addition, the current legislation contains a general reference which not only shows again the strong policy of Congress to preserve and perpetuate the rights of States and political subdivisions thereof to adopt and enforce their own standards for limitations regarding discharge of pollutants but specifically prevents such States or political subdivisions from adopting less stringent standards for limitations than those applied by the Federal authorities. In the same enactment, Congress provided that new legislation should not "be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 33 U.S.C.A. § 1370 (1975 Supp.).

In our opinion, these repeated congressional pronouncements show the continuing intention of Congress not only to perpetuate rights of municipalities, such as plaintiff, to adopt and enforce requirements to abate pollution more stringent than any which may be adopted under the Federal system but also to make certain that this activity by States and municipal corporations, such as plaintiff, continues for the public benefit.

All of these strong and reiterated provisions regarding the continuing

rights of States and municipalities to protect their water supplies must be construed and considered in connection with the specific Illinois enactment granting plaintiff "power and authority to prevent the pollution of any waters from which a water supply may be obtained by any city, town or village within the district." This same enactment authorizes plaintiff to commence action in the circuit court in the county in which plaintiff is located "for the purpose of having the pollution stopped and prevented either by mandamus or injunction." (Ill. Rev. Stat. 1973, ch. 42, par. 326aa.) This is in addition to the common-law right vested in plaintiff or in any other municipal corporation to institute and prosecute all necessary court action to eliminate pollution of water supplies as a common law nuisance.

In addition to this extensive legislative background, we note the provision in the permit issued to defendant providing that nothing therein "shall be construed to preclude the institution of any legal action or relieve the permitee from any responsibilities, liabilities or penalties established pursuant to any applicable State Law or regulation under authority preserved by section 510 of the Act." 33 U.S.C.A. § 1370 (1975 Supp.).

■■ In this court, defendant urges strongly that the trial court and the Federal administrative agency are actually hearing the same matter and that orderly and sensible coordination of their work would best be served by application of the doctrine of primary jurisdiction. According to the defendant's view, there are "intricate, complex and voluminous scientific, technological, and economic facts relevant to the present action [which] must be determined in the first instance by the specialized agency through its expertise." It is defendant's contention that "consistency and uniformity in the determination of factual questions" raised in both the administrative hearing and the present action are indispensable and that these objectives can be accomplished only if this court will stand aside and permit completion of the fact-finding process by the administrative body; with the thought that, after this process has been concluded, this court will then be free to exercise its own jurisdiction concerning abatement of pollution of municipal drinking water. We cannot accept this argument. In our opinion, it is based entirely upon the faulty and erroneous premise that both this court and the Federal administrative agency are dealing with the identical problem. From a completely general and superficial point of view, it may be stated with an apparent degree of validity that the ultimate objective of both jurisdictions is attainment of an unpolluted water supply. But, the method and manner of reaching this desired objective is entirely different in the two jurisdictions.

The adjudicatory hearings before the Federal agency will be concerned

with a permit which expressly approves and validates continued pollution of the water supply until its expiration date of July 31, 1979. The record does not show precisely what is expected to follow after the expiration date. However, it seems from the Federal statute that another permit will then be issued in an attempt gradually to eliminate the pollution problem. In complete contrast, the proceedings before this court are not concerned with a gradual and permissive elimination of the problem. The gist of the abatement action is, exactly as its name implies, an attempt to terminate the pollution, subject only to such essential delays as may be absolutely necessary and unavoidable. In short, the Federal administrative hearings are concerned with permissive regulation, and the proceedings before us involves total abatement. The proceedings before us are thus completely divergent from the matter pending before the administrative body. In a situation of this type, the doctrine of primary jurisdiction is not applicable. We do not have here an issue of priority of jurisdiction but we have two tribunals which are approaching a problem from entirely different points of view and which are attempting to exercise jurisdiction in two entirely different matters. This conclusion is strongly supported by a number of factors.

Were we to apply the doctrine of primary jurisdiction, this court would be required completely to overlook the strong and definite language used by Congress with the clear objective of encouraging the rights of municipalities in the field of water pollution abatement. We would be obliged to conclude that the language of Congress, which expressly permits municipalities to adopt more stringent standards, is meaningless. The only conclusion which we can reach from the express provisions enacted by Congress is that the legislation creating the administrative body may not be construed as affecting the jurisdiction of the states with respect to the waters in question. It seems manifest that the Congress intended by this and other language in the statute expressly to preserve for exercise by the States the type of jurisdiction here sought to be invoked by plaintiff. In addition, to reach agreement with defendant's point of view, we would also similarly be obliged completely to disregard the language of the administrative permit above set forth. We note *Barrington Hills Country Club v. Village of Barrington,* 357 Ill. 11, 21, 22, 191 N.E. 239, where the court relied upon similar language in a Sanitary Water Board permit as a factor in permitting an action in equity to abate water pollution as a nuisance despite issuance of the permit.

We have considered the decision which first established the primary jurisdiction doctrine. (*Texas & Pacific Ry. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 51 L.Ed. 553, 27 S.Ct. 350.) We are aware that the doctrine was fashioned and applied by the court despite the specific statement by

Congress in the Interstate Commerce Act that the legislation was not intended to abridge or alter previously existing common law remedies. The decision involved the need for uniformity of rates charged by a common carrier. This is a totally different field depending upon facts and concepts completely immaterial in the case before us. While uniformity is essential concerning rates charged by a common carrier, no such factor exists in abatement of water pollution. Virtually the identical argument was raised by this defendant and expressly rejected by the Supreme Court of Illinois with reference to a case involving pollution of the waters of Lake Michigan by discharging of oil. See *Metropolitan Sanitary District v. United States Steel Corp.*, 41 Ill.2d 440, 443, 243 N.E.2d 249.

Prior to adoption of the 1972 Water Pollution Control Amendments, the supreme court held that the Federal legislation as it then existed did not in any manner curtail the right to abatement of water pollution as a public nuisance (*Illinois v. City of Milwaukee*, 406 U.S. 91, 104, 31 L. Ed.2d 712, 92 S.Ct. 1385):

> "The application of federal common law to abate a public nuisance in interstate or navigable waters is not inconsistent with the Water Pollution Control Act. Congress provided in § 10(b) of that Act that, save as a court may decree otherwise in an enforcement action, '[s]tate and interstate action to abate pollution of interstate or navigable waters shall be encouraged and shall not * * * be displaced by Federal enforcement action.'"

After the adoption of these amendments, two decisions by District Courts reached the same conclusion regarding the absence of legal effect of the amendments upon preexisting rights to abate water pollution as a nuisance. In *United States ex rel. Scott v. United States Steel Corp.* (N.D. Ill. 1973), 356 F. Supp. 556, the court affirmed the right of the United States and the State of Illinois to proceed by common-law action to abate water pollution as a nuisance. The court did not find in the 1972 amendments any provision "which purports to abolish the Federal common law of nuisance but rather an intention to supplement and amplify any preexisting remedies."

The same conclusion was reached in *People ex rel. Scott v. City of Milwaukee* (N.D. Ill. 1973), 366 F. Supp. 298, 300. The court stated:

> "An analysis of the 1972 amendments of the Federal Water Pollution Control Act clearly shows that Congress in no way intended to destroy any remedies available to the states prior to the passage of the 1972 amendments. Thus, in § 101(b), the Congress adopts a statement very similar to that which previously existed in 33 U.S.C. § 1151(b):

'It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of the States to prevent, reduce and eliminate pollution.'"

It is correct that these cases did not directly involve the doctrine of primary jurisdiction. They are, however, specific precedents regarding the legal effect of the 1972 Water Pollution Control Amendments. These decisions should not be disregarded in determination of whether this court should invoke a theory created by the courts themselves.

Defendant's counsel urge strongly that there are operative reasons which require application of primary jurisdiction to the situation before us. Defendant first cites, as the guiding principle for this determination, the following language from *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 64, 1 L.Ed.2d 126, 132, 77 S.Ct. 161:

"No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation."

Defendant analyzes the case by advancing three reasons indicating the necessity for administrative action. First, defendant contends that application of primary jurisdiction will result in "orderly and sensible coordination" between the roles of court and agency. Defendant amplifies this statement by expressing the thought that the Environmental Protection Agency has powers and skills to ascertain proper water quality standards, to evolve compliance schedules for achieving abatement and to provide a forum where all rights and interests of all parties will be protected. The record before us does not show any evidence of these facts. Even assuming that they exist, they do not, in our opinion, constitute a sufficient reason for withholding the jurisdiction of this court which has already properly been invoked by plaintiff. The record before us demonstrates no reason why the trial court cannot obtain expert testimony and then act with reasonable promptness to secure complete abatement as distinguished from palliative gradualism.

Defendant's second contention is the presence of "intricate, complex and voluminous scientific, technological and economic facts relevant to the present action" which must be determined by the specialized administrative agency. We cannot agree with this statement. On oral argument, counsel for plaintiff informed us that there is presently cooperation between representatives of defendant, of plaintiff and of the administrative agency in checking and monitoring the level of polluting discharges from defendant's plant. The questions posed by defendant can be solved by the trial court in the case before us with the help of the same experts who would of necessity be called to testify before the United States

Environmental Protection Agency. Examples of these questions put by defendant are the ecological effect of discharges from defendant's plant into Lake Michigan and other waters; effects of these discharges upon public use and enjoyment of the waters; the level of discharge of pollutants by defendant's plant "which would have no deleterious effect" upon the use and enjoyment of the water supply; what abatement facilities are necessary and by what date should construction of these facilities be completed. If it is true, as defendant suggests, that any tribunal which hears this matter will be confronted with complicated facts requiring expert assistance, we know of no reason why testimony of these same experts cannot be successfully applied by the trial court. As defendant points out in its reply brief, in *United States v. Rohm & Haas Company* (5th cir. 1974), 500 F.2d 167, the court explained that one essential reason why primary jurisdiction was not invoked was that experts from the Federal agency "were consulted and testified in detail and at length" before the court. 500 F.2d 167, 175.

The third reason advanced by defendant is the need for "consistency and uniformity" between the adjudicatory hearing under the National Pollutant Discharge Elimination System and the trial court. As we have shown, the adjudicatory hearing and the abatement proceedings approach the problem from different points of view. The 1972 Amendments expressly declare and preserve the rights of local government to evolve and enforce more stringent requirements than those of the administrative body as contained in the permit issued to defendant. Thus, we cannot accept defendant's argument that "a difference in orientation [between the two tribunals] would in all likelihood result in irreconcilable determinations of fact and incompatible abatement programs."

The trial judge heard all of these arguments, presumably advanced by defendant's able counsel with the same force and skill that they have demonstrated in this court. The trial court remained undaunted by the grim prospect of the possibility of irreconcilable differences or the pressing need for primary administrative determination. In our opinion, all necessary factual questions presented by this record can be determined by the trial court with at least the same, and perhaps greater, skill and expertise than any administrative body would manifest.

Defendant cites many additional cases which it depends upon to illustrate application of the doctrine of primary jurisdiction by the courts of Illinois:

*City of Chicago v. General Motors Corp.* (N.D. Ill. 1971), 332 F. Supp. 285, involves a class action by the city of Chicago in an attempt to prevent manufacturers of motor vehicles from polluting the air of the city. The District Court first held that the suit could not be continued by

plaintiff as a class action. The court also held that Federal law had pre-empted the right of States and political subdivisions thereof to enforce any standard relating to the control of emissions from new motor vehicles. (42 U.S.C. § 1857f—6a(a), cited at 332 F. Supp. 285, 290.) Regarding older automobiles not included within this statute, the court was of the opinion that plaintiff should and could proceed under the Environmental Control Act of Illinois before the Pollution Control Board. (Ill. Rev. Stat. 1973, ch. 111½, par. 1001 *et seq.*) The question of air pollution by millions of automobiles entering the city of Chicago from other states and countries may hardly be compared to the situation involving water pollution by the defendant's facilities. Automobile emission standards necessarily require a uniformity of Federal regulation.

*Dunlap Lake Property Owners Association, Inc. v. City of Edwardsville*, 22 Ill.App.2d 95, 159 N.E.2d 4, is entirely inapposite on its facts. There, this court (Fourth District) reversed an injunction against continued use by the city of Edwardsville of a sanitary sewer which allegedly caused sewage to flow into plaintiff's private lake. The court held that "there was no actual evidence of pollution." (22 Ill.App.2d 95, 98.) The court also pointed out that there was no dispute as to the public policy of the State "in the control, abatement and prevention of the pollution of public waters." (22 Ill.App.2d 95, 97.) The court expressed its attitude that control and abatement of water pollution is "best left to the specialized agency therewith concerned except in cases of flagrant and obvious pollution." (22 Ill.App.2d 95, 99.) The court proceeded upon the basis heretofore expressed that the matter of the existence of pollution was left open for determination but also took the position that cases of flagrant and obvious pollution should necessarily be the subject of abatement by the courts. In the case before us, the fact of pollution of drinking water by discharges from defendant's plant is a matter of common knowledge. This fact is conceded by the defendant as demonstrated by the permit under which it claims to be authorized to continue to pollute the water supply. Thus the case at bar comes within the *Dunlap Lake* classification of "flagrant and obvious pollution." Need for expertise which may arise in the record before us will come not from any issue regarding existence of pollution but only from defendant's attempts to postpone complete cessation of the water pollution which its activities cause.

*Dunlap Lake* is to be contrasted with *Metropolitan Sanitary District v. United States Steel Corp.*, 41 Ill.2d 440, 243 N.E.2d 249, where uncontroverted expert testimony established the fact of pollution of the drinking water and the Supreme Court of Illinois expressly upheld the power of the court in proceedings to enjoin water pollution.

*Bank of Lyons v. County of Cook*, 13 Ill.2d 493, 150 N.E.2d 97, involves exhaustion of remedies. We will later set out the complete difference between primary jurisdiction and exhaustion of remedies. The latter principle has no application in the case before us. *Salk v. Department of Registration & Education*, 123 Ill.App.2d 320, 260 N.E.2d 123, *City of Wheaton v. Chicago, Aurora & Elgin Ry. Co.*, 3 Ill.App.2d 29, 120 N.E.2d 370, and *Colton v. Commonwealth Edison Co.*, 349 Ill.App. 490, 111 N.E.2d 363, all involve exhaustion of remedies.

After consideration of all of the many authorities cited by both sides, including those which lack of space prevents us from commenting upon, we have concluded that the closest case to the one before us is *State ex rel. Shevin v. Tampa Electric Co.* (Fla.App. 1974), 291 So.2d 45, *cert. denied* (Fla. 1974), 297 So.2d 571. There, the trial court dismissed a suit for injunction to restrain pollution of the air by defendant's plant. The court acted upon the doctrine of primary jurisdiction. The appellate court examined and explained the doctrine and held that it was erroneously applied by the trial court. The court pointed out that "[t]he determination of a public nuisance as prayed for here, for example, is historically a judicial function, but is not necessarily dependant upon technically established criteria for its resolution." (291 So.2d 45, 47.) Defendant takes the position that the Florida Appellate Court proceeded upon the absence of technical questions of fact. The court did indeed state that the issue in a nuisance abatement case was primarily a matter of law in determining whether the conditions complained of constitute a nuisance. The court also pointed out, however, that the ultimate question for judicial decision was whether these conditions "constitute a nuisance as a matter of law." (291 So.2d 45, 48.) The court did not state that there were no questions of fact but specifically noted that if there were "practicalities" involved which required consideration from a technological point of view, that regardless of the potentially technical nature of these matters "they more properly ought to be taken into account by the trial court in the mandate of any injunctive relief deemed warranted." At this point the court further stated (291 So.2d 45, 48):

> "Certainly, the primary jurisdiction doctrine notwithstanding, highly technical matters per se are no strangers to the courts. In any case, the existence of such 'practicalities,' of itself, is surely not a ground for either dismissal of the action or for the invocation of the 'primary jurisdiction' doctrine as we understand it to be."

We, therefore, come to the considered conclusion that the trial court was completely correct in denying the motion of defendant to stay or alternatively to dismiss the proceedings on the ground of primary jurisdiction.

■■  The second legal theory stated by defendant in support of its desire to stay these proceedings is that of exhaustion of remedies. This contention may be readily shown to be inapplicable here. As pointed out by Professor Davis, primary jurisdiction "is altogether different from the doctrines of exhaustion and of ripeness which govern the timing of judicial review of administrative action. The doctrine of primary jurisdiction determines whether the court or the agency should make the initial decision." (3 Davis, Administrative Law Treatise § 19.01, at 2 (1958).) The Illinois Supreme Court has defined exhaustion of remedies as applicable to a situation where "a party aggrieved by administrative action ordinarily cannot seek review in the courts without first pursuing all administrative remedies available to him." (*Illinois Bell Telephone Co. v. Allphin*, 60 Ill.2d 350, 358, 326 N.E.2d 737.) As stated in *United States v. Western Pacific R.R. Co.*, the doctrine of exhaustion "applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course." (352 U.S. 59, 63.) Under any of these slightly variant definitions, the doctrine patently has no application here.

This conclusion is fortified by examination of *Bank of Lyons v. County of Cook*, 13 Ill.2d 493, 150 N.E.2d 97, most strongly relied upon by defendant in this regard. There, the Supreme Court of Illinois dismissed an action which sought to invalidate a zoning ordinance in its application to plaintiff's property on the theory that plaintiff had failed to exhaust administrative remedies. It was agreed that plaintiff had failed completely to seek relief before the Cook County Board of Zoning Appeals. The supreme court held that the administrative remedy was readily available and that it should have been resorted to in the interest of an orderly procedure. The holding in *Bank of Lyons* is readily reconciled with the above legal definitions by Professor Davis and the courts. The zoning claim in *Bank of Lyons*, was "cognizable in the first instance by an administrative agency alone." There, the trial court had jurisdiction only after the administrative body had first passed upon the claim. On the contrary, in the case before us, the issues regarding abatement of a nuisance are not cognizable by the administrative body.

One final matter requires additional discussion. Defendant's original and reply briefs are replete with assertions that the trial of this case will present many technical and complicated facts which must be the subject of proof before the trial court. The very basis of defendant's argument is that these facts are best presented to an administrative agency for determination prior to trial by the court. This seemingly valid argument requires analysis from another point of view.

Plaintiff's complaint presents a rather simple subject; namely, that

the operation of defendant's plant has severely fouled and polluted the water of Lake Michigan. This basic fact is virtually conceded by defendant which has obtained and relies upon a permit from the United States Environmental Protection Agency. This document is, in effect, an admission of present water pollution by defendant's plant and a license to continue this pollution in varying degrees for a number of years. It follows necessarily that the central issue which the trial court will be obliged to decide in the case presented by plaintiff is a pure issue of law as to whether the amount and type of water pollution expressly authorized by the permit constitutes an abatable nuisance under the law of Illinois. The necessity for complicated fact-finding by the trial court will arise principally from matter which defendant may wish to offer in its defense.

Defendant filed a verified motion in which it stated a pure conclusion that the administrative agency in its adjudicatory hearing "is required to make the same factual determinations, involving complex and intricate scientific, technological, and economic questions, as are presented to this court in the present matter." According to the record before us, defendant did not present any evidence to the trial court. There is no proof that these "complex and intricate" questions indeed exist; or, that the trial court would necessarily be confronted with matters of this type. Certainly bare assertions by counsel upon a matter they classify as so complicated, such as the expenditure required to prevent further water pollution from defendant's activities, cannot replace evidence. Thus, defendant's posture in this appeal is that of a party who has presented a conclusory allegation in its pleading without any evidence or even an offer of proof to support its contention. See *Burke v. Burke*, 12 Ill.2d 483, 487, 147 N.E.2d 373.

The order appealed from contains a recital that the court heard oral argument and was "advised in the premises." In view of this recital in the order, in the absence of contrary indication reflecting presentation of testimony to the court, we must assume "that the decision rendered by the court was the right decision and was justified by the facts before it." (*Smith v. Smith*, 36 Ill.App.2d 55, 59, 183 N.E.2d 559, cited in *Dorbin v. Yellow Cab Co.*, 14 Ill.App.3d 586, 588, 302 N.E.2d 633, which also cites *Skaggs v. Junis*, 28 Ill.2d 199, 201, 202, 190 N.E.2d 731.) Thus, in addition to the considerations above set forth, this court is clearly mandated by the law of Illinois to affirm the order appealed from.

Order affirmed.

EGAN and SIMON, JJ., concur.