THE CITY OF CHICAGO, Plaintiff-Appellee, *v.* JENS P. NIELSEN *et al.,*
Defendants-Appellants.

First District (1st Division)    No. 60184

Opinion filed May 17, 1976.

Allan L. Blair, of Chicago, for appellants.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale and Michael J. Kelly, Assistant Corporation Counsel, of counsel), for appellee.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

S. A. S. Co., a corporation (defendant) appeals to this court from a decree directing it to demolish a piece of improved residential real estate owned by it on the south side of the City of Chicago. In this court, defendant urges that the decree for demolition was beyond the authority of the City to obtain and of the court to enter; the City is estopped from proceeding against defendant and the City is not entitled to equitable relief. The City responds that the decree was within the scope of general chancery powers and consistent with the applicable statute; defendant has not shown estoppel by clear and unequivocal evidence and estoppel cannot apply where the acts relied upon were performed by a municipal officer acting outside the scope of his statutory authority. The applicable facts will be stated in connection with the discussion of each contention.

The property is an apartment building containing about 26 units in three stories with a basement, commonly known as 1304—1306 East 70th Street and 6957-6967 South Kimbark Avenue. Defendant acquired title to the real estate on January 31, 1973, or February 1, 1973, and operated the property for about one month.

On February 22, 1973, the City filed a complaint for demolition of the property and other relief. The only defendant to the cause was Jens P. Nielsen. Defendant had acquired its interest in the property by deed from Nielsen issued after a sale of the property for failure to pay general taxes. The complaint alleged a great many defects in the building which were described as serious and as having a potential effect upon the health, welfare and safety of the occupants. These defects, stated in detail, included presence of lead or lead compounds on interior walls; defective or missing members of a porch system; lack of means for garbage and refuse removal; broken or missing window panes; need to replaster walls and ceilings and need to remove defective and dangerous carpeting in the halls.

Count I of the complaint prayed for imposition of a fine against defendant. It alleged that the proceeding was brought pursuant to designated sections of the revised statutes. Count II of the complaint alleged the need for injunctive relief and that the Commissioner of

Buildings of Chicago had determined that the property was dangerous and unsafe. The complaint prayed for injunctive relief, for an order authorizing demolition of the improvements by the City with a personal judgment against defendant and a lien upon the real estate for the cost thereof, and for general relief. On March 30, 1973, defendant was duly made party to the proceedings. On June 26, 1973, the circuit court entered an order for the building to be vacated and for the clerk of the court to issue a writ of assistance for this purpose.

On August 21, 1973, defendant filed an answer to the complaint in which it admitted "that the building is dangerous and hazardous." Affirmative defenses were alleged in the answer to the effect that defendant had made a verbal agreement with an assistant corporation counsel to give a deed to the City. This official stated that the City would accept the property only if there were a pending suit for building violations and the building was vacant. Defendant agreed to these terms and "caused the instant suit to be brought immediately * * *." In reliance thereon defendant caused the building to become vacant. A fire then occurred from unknown origins making the building dangerous and hazardous.

Turning to defendant's initial contention, the pertinent statute provides that (Ill. Rev. Stat. 1971, ch. 24, par. 11—31—1)[1]:

"The corporate authorities of each municipality may demolish, repair or cause the demolition or repair of dangerous and unsafe buildings or uncompleted and abandoned buildings * * *."

The statute also provides that the cost of such demolition shall be recoverable from the owners of the real estate and shall be a lien thereon with other provisions for enforcement of the lien. Defendant urges that this cause should be controlled by the statute and that the intention of the legislature was to limit the authority of the City "to either demolish unsafe buildings itself or to hire an outside agency to do such work * * *."

The single case cited and relied upon by defendant is *Village of Louisville v. Webster* (1884), 108 Ill. 414. There, a village ordinance enacted under the authority of the Cities and Villages Act, as it then existed, provided for removal of dangerous property. The statute in question empowered the City to direct that all and any buildings which became damaged to the extent of 50 percent "shall be torn down and removed." The Supreme Court held that the City was limited by this grant of power only to direct that buildings were to be torn down and removed. However, the court expressly pointed out that the statute did not by its terms empower the City "to *cause* the building to be torn down

[1] This section was amended in 1971. The amendments, not pertinent here, do not apply within the jurisdiction of any home rule unit such as City of Chicago. See Ill. Const., art. VII, §6(a).

* * *." (108 Ill. 414, 418.) This appears to us strongly to imply that the court in that case considered the power to cause removal of the building as broader and more inclusive than the power to direct its removal.

■■ Defendant contends that because the statute was amended after *Village of Louisville* by omitting the power "to direct" and substituting the power to "cause" demolition, the City is now limited to the power to cause demolition. This argument is based upon the familiar principle that when a statute is amended the legislature thereby intended a result different from what existed prior to such amendment. *(Lindley v. Murphy* (1944), 387 Ill. 506, 56 N.E.2d 832.) This argument necessarily fails because the statute construed in *Village of Louisville* was repealed in 1961 (Ill. Rev. Stat. 1961, ch. 24, at 964), and last appeared in the Revised Statutes of Illinois in 1959. (See Ill. Rev. Stat. 1959, ch. 24, par. 23—71.) The completely new statute involved in this appeal was first enacted in 1953. (Ill. Rev. Stat. 1953, ch. 24, par. 23—70.2.) Therefore, the Act with which we are concerned is not an amended version of the statute construed in *Village of Louisville*, but is a completely new enactment. The earlier statute thus has no bearing upon the intent of the General Assembly in adopting the language at issue here.

■■ Further, in arriving at the result which we do, that *Village of Louisville* is not pertinent here, we note also that the grants of legal power to municipal authorities in the former Cities and Villages Act were to be strictly construed with any reasonable doubt to be resolved against the municipality. (*City of Chicago v. Santor* (1975), 30 Ill. App. 3d 792, 795, 334 N.E.2d 176, citing *Crerar Clinch Coal Co. v. City of Chicago* (1930), 341 Ill. 471, 475, 173 N.E. 484, and other cases there cited.) The statute before us does not empower adoption of implementing ordinances by the City but is, in itself, a grant of power. It is intended to give the City an effective tool for protecting its citizens from the unfortunate and degrading results of substandard and dangerous housing. For this reason a more reasonable rather than a strict construction of the statute would seem to be required.

■■ It is a familiar rule that where statutory "language is certain and unambiguous, the proper function of the courts is to enforce the statute as enacted. [Citation.] * * * [C]ourts will assume that words have their ordinary and popularly understood meaning." (*General Motors Corp. v. Industrial Com.* (1975), 62 Ill. 2d 106, 112, 338 N.E.2d 561; *Bovinette v. City of Mascoutah* (1973), 55 Ill. 2d 129, 133, 302 N.E.2d 313.) The verb "cause" appears to us, as it did to the Supreme Court of Illinois in *Village of Louisville*, to be somewhat broader than the word "direct." The dictionary defines "cause" in a number of ways including "[t]o lead, induce, make, or compel * * *." (Funk & Wagnalls New Standard Dictionary.) This statutory grant of power should carry with it by clear

implication everything necessary to carry out the power and to make it complete and effective. *People ex rel. County of Du Page v. Smith* (1961), 21 Ill. 2d 572, 580, 173 N.E.2d 485.

■■ This is particularly true when we consider the intent and purpose of this type of legislation. "The purpose of the act is clear. It is to give the city a quick and effective means of removing those unused and dilapidated structures that present danger and blight." (*City of Chicago v. James E. Mulligan Enterprises, Inc.* (1960), 27 Ill. App. 2d 481, 487, 170 N.E.2d 13.) In the case before us it was necessary for the City to use this enactment to protect people who were compelled by financial circumstances to live in blighted areas. Their occupancy of dangerous structures, such as involved in the case before us, creates a clear and present danger to health and to life itself which it is the prime duty of every municipality to attempt to rectify. We cannot, by imposing the type of strict and unreasonable construction for which this defendant contends, curtail in any manner the power and ability of the modern city to meet this type of challenge.

In addition, the statute provides that where the demolition is undertaken by the City the cost thereof "is recoverable from the owner* * *." This indicates a statutory intention to fix personal liability on the owner for the cost of demolition. It is common knowledge that in many instances the value of the land itself may not be sufficient to enable recovery by the City of the cost of demolition. In such cases, if the City were obliged to advance the money for each and every wrecking operation, attempted recovery of such outlay merely by a lien upon the vacant land would be futile. Therefore, the stilted and unnatural requirement that the City itself retain the services of a wrecker and then attempt collection of the cost from the owner imposes a useless circuity upon the process of ridding the inhabitants of the City of an obnoxious and dangerous condition.

■■ Quite aside from the statutory authority of the City to require demolition of a dangerous piece of property by the owner, the common law power of any municipality to abate a nuisance also seems clear. "Municipal corporations may call upon a court of equity for assistance to abate nuisances." (*City of Chicago v. Fritz* (1962), 36 Ill. App. 2d 457, 465, 184 N.E.2d 713.) Neither citation of authority nor argument should be required to establish that the admittedly dangerous structure here involved must necessarily be classified as a nuisance subject to abatement at common law.

■■■ This common law right held by municipalities was not repealed by the statute in question. See *Reeves v. Eckles* (1966), 77 Ill. App. 2d 408, 410, 222 N.E.2d 530, where this court pointed out that the repeal of the common law by implication is not favored. This type of repeal will be

applied only where repugnance exists between the common law and the statute and, since the legislature presumably knew the common law, express repeal would have been simple had that body so intended. "The prevailing principle is that the common law remains the law of Illinois unless it is expressly revoked by the statute." (*Schwartz v. City of Chicago* (1974), 21 Ill. App. 3d 84, 93, 315 N.E.2d 215, citing *Waesch v. Elgin, Joliet & Eastern Ry. Co.* (1962), 38 Ill. App. 2d 56, 186 N.E.2d 369.) Even the fact that a nuisance is a violation of criminal law or is also the subject of a statutory definition will not bar equitable interference where the common law basis for equitable jurisdiction exists. (*City of Chicago v. Geraci* (1975), 30 Ill. App. 3d 699, 702, 703, 332 N.E.2d 487, *leave to appeal denied,* 60 Ill. 2d 596, and *City of Chicago v. Fritz* (1962), 36 Ill. App. 2d 457, 465, 184 N.E.2d 713.) The first count of the City's complaint which prayed for the imposition of a fine cited the pertinent statute. The second count sought demolition of the premises as abatement of a nuisance. In addition, "Except in case of default, the prayer for relief does not limit the relief obtainable* * *" aside from cases of surprise. Ill. Rev. Stat. 1975, ch. 110, par. 34.

Defendant also contends that the court exceeded its jurisdiction by entering the decree appealed from. The existence of implied power in a court of chancery to abate a nuisance hardly requires elucidation. The Illinois Constitution of 1970 abolished courts of limited jurisdiction and consolidated all law and chancery powers of every kind in the unified circuit courts which have "original jurisdiction of all justiciable matters* * *." (Ill. Const., art. VI, §9.) Thus the chancery division of the circuit court of Cook County, in which this case was tried, was endowed with all the powers of every kind previously vested in courts of chancery. No argument is required to demonstrate the fact that courts of chancery have implied and traditional powers to abate a nuisance. In *Metropolitan Sanitary District v. United States Steel Corp.* (1975), 30 Ill. App. 3d 360, 366, 367, 332 N.E.2d 426, *leave to appeal denied,* 60 Ill. 2d 597, we noted that this power has existed for many years. We held that, despite the existence of a statute authorizing abatement of water pollution and additionally the existence of a statutory scheme of Federal legislation for this purpose, courts of chancery have power by injunction and otherwise to abate the nuisance of pollution of a water supply. The cases there cited by us leave no doubt as to the existence of this inherent power of the court in the case before us. We conclude that the decree appealed from had proper legal basis.

Defendant's contention that the City should be estopped from proceeding against it is lacking in factual and legal validity. As regards the pertinent facts, it must first be considered that estoppel has been defined as including, "the concept of reliance by one party, to the extent of a

change of position to his detriment in good faith, upon the conduct of the other as a result of which that other party will not be permitted to raise a contention inconsistent with his misleading conduct." (*Allstate Insurance Co. v. National Tea Co.* (1975), 25 Ill. App. 3d 449, 461, 462, 323 N.E.2d 521, *leave to appeal denied*, 58 Ill. 2d 596, citing *Hickey v. Illinois Central R. R. Co.* (1966), 35 Ill. 2d 427, 447, 220 N.E.2d 415.) As to the burden of proof, it has been repeatedly held that the party who asserts the existence of estoppel, "has the burden of proving it, and the proof must be clear, precise and unequivocal." *Jennings v. Bituminous Casualty Corp.* (1964), 47 Ill. App. 2d 243, 249, 197 N.E.2d 513. See also *Slavis v. Slavis* (1973), 12 Ill. App. 3d 467, 474, 299 N.E.2d 413.

■■ In the case before us, Allan L. Blair, attorney of record, was the only witness for defendant who gave probative testimony regarding the alleged estoppel. Mr. Blair was attorney of record for defendant since the inception of its relationship with this litigation and continued to serve in that capacity in the trial court and in this court. These circumstances cast a cloud upon his testimony. (*Lavin v. Civil Service Com.* (1974), 18 Ill. App. 3d 982, 991, 310 N.E.2d 858, and authorities there cited.) He testified that the defendant, of which he is sole shareholder and principal operating officer, obtained title to the property here involved about January 31 or February 1, 1973. The defendant operated the property for one month. During March or early April, Mr. Blair called Mr. Timothy O'Hara, an attorney who is an assistant corporation counsel for the City of Chicago.

Mr. Blair testified that Mr. O'Hara told him that the City of Chicago would accept title to the property but only if a demolition suit was pending and the building was vacated. Mr. Blair then requested that the suit be filed right away. He believed that the next act was that the City filed suit. He testified that thereafter he had several additional conversations with Mr. O'Hara, "confirming what our arrangement was* * *." Accordingly defendant requested that all tenants vacate and helped them to move.

The witness further testified, without stating facts, that, "vandals set the building afire, and the building was substantially burned." He again offered the deed to the City and Mr. O'Hara stated that the City had changed its mind and would not accept conveyance of the property unless it was first demolished. He testified that he had previously made such arrangements with Mr. O'Hara and with other assistant corportion counsel and that such agreements had never been repudiated. Again stating pure conclusions, he testified that defendant had acted upon this agreement to its detriment.

In response to this evidence, Mr. O'Hara testified that he was not familiar with the property in question and that he had no authority to bind the City in relation to the acceptance of deeds. The witness also testified

that he did not recall the exact conversation which allegedly took place between himself and Mr. Blair in late March or early April. He did recall that Mr. Blair had told him that he was in control of a building that was beyond repair and that had to be vacated and probably torn down. Mr. Blair then asked if the City would accept a deed to the property and wreck the building.

Mr. O'Hara testified that he also stated that he had no idea whether such deed could be accepted but that no deed would be accepted until the property had been demolished. This could only be accomplished by a lawsuit. He fixed this first conversation with Mr. Blair as having occurred in February. The witness also recalled another conversation with Mr. Blair in March, in which Mr. Blair asked him why the demolition suit had not been filed. Mr. O'Hara further testified that he was certain, or almost certain, that he never told Mr. Blair to vacate the building and that the City would then take title. He testified that he did not know what interpretation Mr. Blair put upon their conversations but that he never intended to give Mr. Blair the impression that he himself would have authority to do so since that authority is granted only to the City Council.

■■ The decree for demolition does not contain a direct statement ruling upon the affirmative defense. Defendant filed a petition for reconsideration which again raised the issue of estoppel. The trial court then entered an order finding that the facts of the case were insufficient to create an estoppel against the City and the petition for reconsideration was denied. In our opinion, the result reached by the trial court in this regard is amply supported by the evidence. The proof falls far short of constituting the type of convincing and unequivocal evidence which is required to sustain the defense of estoppel. On the contrary, the evidence on this point preponderates in favor of the City. In our opinion, all reasonable persons would agree that the ruling of the trial court in this regard is not contrary to the manifest weight of the evidence. (*Reese v. Melahn* (1973), 53 Ill. 2d 508, 512-13, 292 N.E.2d 375.) This ruling may not be reversed by this court.

For the sake of completeness, we will also point out the legal deficiencies in the attempted defense of estoppel. Any agreement between defendant and the City of Chicago for conveyance of real estate by defendant to the City, with the understanding that the City was to pay the cost of demolition thereof, necessarily required the approval of a majority of all members of the City Council of the City of Chicago. Ill. Rev. Stat. 1971, ch. 24, par. 3—11—17.

This has been the law of Illinois for many years. Mr. Blair, an attorney of wide knowledge and experience, sole shareholder of the defendant

corporation, was not only presumed to have knowledge of this long existing statutory requirement but certainly must have come in contact with it at some time during his practice and thus have received actual knowledge. The existence of this statute and its applicability to the situation before us effectively prevents the existence of an estoppel here. Any member of the Corporation Counsel's Office was completely lacking in authority to enter into such an arrangement which necessarily required approval by the City Council of the City of Chicago. *M.A.T.H., Inc. v. Housing Authority* (1976), 34 Ill. App. 3d 884, 886-87, 341 N.E.2d 51.

This record shows no special circumstances upon which defendant was induced by the conduct of municipal officers to take steps which caused substantial loss. (See *City of Marseilles v. Hustis* (1975), 27 Ill. App. 3d 454, 325 N.E.2d 767.) An experienced lawyer who had handled other matters of this type would not rely upon the bare oral promise of an assistant corporation counsel. Nor is detriment of any kind reflected by this record as a result of the alleged dealings between the parties. There is no competent or factual evidence in the record to show that the vacation of the premises was the proximate cause of the subsequent fire. The attempted defense of estoppel is accordingly rejected.

The final contention made in defendant's brief is that the City is not entitled to equitable relief because it has failed to do equity. This contention is predicated upon a number of unsupported statements contained in defendant's brief. It is not correct, as defendant asserts, that this litigation was originally brought for minor violations; that the parties assumed that the suit was brought at the express request of defendant; that defendant caused the premises to be vacated in reliance upon an agreement with the City and that this vacation was the prime cause of a fire which in turn placed the building in a dangerous condition.

In his testimony, Attorney Blair made a statement that he had represented a client who had acquired a tax deed to a piece of property owned by a close member of Mr. O'Hara's family. Mr. O'Hara specifically denied this and stated that he was unaware of this until two weeks before the time of his testimony, which would be the latter part of September 1973. Mr. O'Hara stated that he had never discussed this matter with his relative nor with Mr. Blair and he added, "It's a complete shock to me." In addition, the testimony of Mr. Blair regarding this alleged transaction between a client of his and a relative of Mr. O'Hara's was only partially stated by Mr. Blair. At that point an objection by counsel for the City was sustained and the court stated that this material would be disregarded. The fragmentary statement of the witness contains no proof regarding the alleged defense of unclean hands. No offer of proof was ever made by defendant so that the necessary pertinent facts

are not before us. See *Pioneer Hi-Bred Corn Co. v. Northern Illinois Gas Co.* (1975), 61 Ill. 2d 6, 17, 329 N.E.2d 228.

The judgment appealed from is accordingly affirmed.

Judgment affirmed.

SIMON and O'CONNOR, JJ., concur.