**MIANUS RIVER PRESERVATION COMMITTEE et al., Petitioners,**

v.

**ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY and Commissioner, State of Connecticut, Department of Environmental Protection, Respondents.**

**No. 1080, Docket 75–4253.**

United States Court of Appeals, Second Circuit.

Argued May 24, 1976.

Decided July 12, 1976.

**900**

Haynes N. Johnson, Stamford, Conn. (Michael V. Ricci, Brooklyn, N. Y., of counsel), for petitioners.

Paul N. Kaplow, Dept. of Justice, Washington, D. C. (Peter R. Taft, Asst. Atty. Gen., Robert V. Zener, Gen. Counsel, Alfred T. Ghiorzi, Dept. of Justice, Washington, D. C., of counsel), for Federal respondent.

Richard F. Webb, Asst. Atty. Gen., Hartford, Conn. (Carl R. Ajello, Atty. Gen., State of Connecticut, Hartford, Conn., of counsel), for State respondent.

Before SMITH, HAYS and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

The Mianus River Preservation Committee and several named individuals who own property along the banks of the Mianus River in Greenwich, Connecticut petition this Court for review of a modification of a National Pollution Discharge Elimination System ("NPDES") permit made by the respondent Commissioner of the State of Connecticut Department of Environmental Protection ("DEP"). The permit had originally been issued by DEP to the Greenwich Water Company ("Water Company") under § 402 of the Federal Water Pollution Control Act Amendments of 1972 ("FWPCA").[1] Petitioners alleged jurisdiction in this Court pursuant to § 509(b)(1)(F) of the FWPCA.[2] For the reasons set forth below, we dismiss the petition for lack of jurisdiction in this Court.

The underlying controversy in this case stems from the fact that the Water Company, which maintains a water filtration plant in which it chemically treats water taken from the reservoir created by a dam on the Mianus River, has for many years discharged chemically treated flocculants into the river below the dam. This practice has apparently resulted in deposits of these flocculants up to five feet in depth in some places in the river below the dam. Consequently, in February, 1972, DEP issued order No. 979, mandating that the Water Company complete facilities for treatment and thereby the reduction of the flocculant discharges into the river by June 30, 1973.

---

1. 33 U.S.C. § 1342 (Supp. IV), quoted *infra*.

2. 33 U.S.C. § 1369(b)(1)(F) (Supp. IV), quoted *infra*.

In May, 1972, DEP extended the compliance date until November 30, 1973. Schedules were set for the submission and approval of various engineering proposals and for the start of construction. Although plans for the discharge treatment facilities which petitioners seem to favor were eventually approved by DEP, for numerous reasons, none the least of which was the Water Company's apparently precarious financial position, construction on those facilities has yet to begin.

Shortly after DEP first extended the facility's completion date, Congress enacted the 1972 Amendments to the FWPCA.[3] Those amendments created, among other things, the NPDES, a system which seeks gradual reduction and, hopefully, elimination of pollutants through the requirement of restrictive permits to those who currently discharge such wastes.[4] Section 402(a)(1) of FWPCA placed the initial responsibility for issuing the NPDES permits with the Administrator of the Environmental Protection Agency ("Administrator"). Sections 402(a)(5) and 402(b) of the FWPCA,[5] however, operate to transfer that responsibility to the respective states, upon each State's request, if the Administrator determines essentially that the requesting State's permit program will meet the requirements of the FWPCA. Connecticut's program was approved and authorized by the Administrator on September 26, 1973.

Consequently, the original DEP order No. 979 was apparently transformed by DEP into a draft NPDES Permit No. CT 0001325 on April 1, 1974.[6] That draft permit continued the requirement that the approved treatment facilities be placed in operation. As can be seen, however, the original compliance date contemplated in order No. 979 had already passed. Subsequently, on March 10, 1975, DEP modified the draft NPDES permit, and issued a formal NPDES permit establishing alternative requirements, namely, that the treatment facilities be completed by July 31, 1977 or that, by the same date, the Water Company connect its discharges to a municipal sanitary sewer system proposed for construction in the area by the Town of Greenwich.[7]

The petitioners objected generally to DEP that the permit as issued was inadequate, that the delays and failure to remedy the discharges in accordance with original order No. 979 were inexplicable, and that the sewer connection alternative did not provide a realistic means for eliminating the discharges since there was no guarantee that such a sewer would ever be constructed by the Town of Greenwich. DEP then conducted a hearing on the permit, at which hearing complaints were aired and more information was gathered. As a result of that hearing, DEP, pursuant to its authority under Chapter 474a of the Connecticut General Statutes,[8] officially modified,[9] the permit on August 26, 1975. Much to the dismay of the petitioners, the modification, rather than requiring an earlier compliance date, extended that date and removed entirely the provisions for the construction of

---

3. Oct. 18, 1972, Pub.L. 92–500, 33 U.S.C. § 1251 (Supp. IV) *et seq.*

4. Although not essential for disposition of the instant petition, a more detailed description of the FWPCA's increasingly restrictive limitations and standards is contained in this Court's recent opinion in *Hooker Chemicals & Plastics Corp. v. Train*, 537 F.2d 620 (2d Cir. 1976). Even more recently, the Supreme Court has reviewed both the history of the FWPCA and the delicate state-federal balance struck in NPDES in *EPA v. State Water Resources Control Board*, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).

5. 33 U.S.C. §§ 1342(a)(5) (Supp. IV) and 1342(b) (Supp. IV), quoted *infra.*

6. The copy of that draft order which has been supplied in the record on review is unsigned and contains blank spaces where certain of the key compliance dates presumably belong. It therefore appears from the record that this particular draft was never finalized as an NPDES permit.

7. The parties indicate in their briefs (Pet. br., p. 4; DEP br., p. 2) that the March 10, 1975 order was the first NPDES permit actually issued to the Water Company by DEP. See *supra*, n. 6.

8. Connecticut General Statutes § 25–54a, *et seq.*

9. Connecticut General Statutes § 25–54*o*.

treatment facilities. The modified permit requires that the Water Company connect its discharges to the Greenwich sanitary sewer by July 31, 1978, thereby completely eliminating any discharge into the Mianus River.

The petitioners challenged the validity of the NPDES permit, as modified, by seeking review in this Court on November 24, 1975 pursuant to § 509 of the FWPCA. They assert that the permit is invalid for two reasons: first, that since the compliance date is July 31, 1978, the permit does not comply with the FWPCA's directive that a permit require the application of the "best practicable control technology" toward the reduction of polluting discharges by July 1, 1977,[10] and second, that since the Greenwich sanitary sewer does not now exist in the vicinity of the filtration plant, and since only the Town of Greenwich can extend the sewer to that area, the permit essentially requires compliance with an act which is not wholly within the control of the permittee Water Company.

Although the respondent Commissioner of DEP has defended the validity of the modified permit on the merits, he has also moved to dismiss the petition for review, and has been joined in such motion by the Administrator, on the jurisdictional ground that § 509(b)(1)(F) of FWPCA[11] provides for review in the appropriate Court of Appeals of only the "*Administrator's action . . . in issuing or denying any permit*

under section [402]" of that Act, not the issuing or denying of such a permit by a State. (Emphasis supplied.) We agree with the respondents and dismiss the petition without reaching the merits.

It is rather clear that jurisdiction in the Court of Appeals to review the issuance, denial or modification of an NPDES permit, if it exists at all, is to be found in § 509 of FWPCA. *Cf. Sun Enterprises, Ltd. v. Train*, 532 F.2d 280, 288 (2d Cir. 1976). The plain words of that section, however, clearly specify review of only the "Administrator's action," the term "Administrator" being defined in § 101(d)[12] as the Administrator of the Environmental Protection Agency. Section 509 leaves unmentioned the review status of permits issued or denied by one other than the Administrator. Because that section explicitly mentions only action of the Administrator and because, as will be discussed *infra*, the legislative history of § 402 clearly shows that Congress intended that the States have a great deal of autonomy in administering their own permit programs, we see no reason to extend the explicit jurisdictional grant to "action" of anyone other than the Administrator. Where, as here, the NPDES permit was undeniably issued and modified by a State agency pursuant to its own authority under § 402, one is hard pressed without more to find such "Administrator's action."

In order to fit this case within § 509's "Administrator's action" requirement, the

---

10. *See* FWPCA § 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A) (Supp. IV).

11. Section 509(b) of FWPCA, 33 U.S.C. § 1369(b) (Supp. IV), provides as follows:

   (b)(1) Review of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, or 1316 of this title, and (F) in issuing or denying any permit under section 1342 of this

title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day.

12. 33 U.S.C. § 1251(d) (Supp. IV) provides in pertinent part as follows:

   (d) Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency (hereinafter in this chapter called "Administrator") shall administer this chapter.

petitioners have advanced two theories: (1) that DEP, in acting upon NPDES permits, serves as the Administrator's agent, thereby rendering the State's action an action of the Administrator through a delegation of authority, and alternatively, (2) that since the Administrator has the authority to reject or "veto" any particular application made by a polluter to a State for an NPDES permit, his failure to veto the application is his "action" sufficient for the jurisdictional purposes of § 509. We find neither theory persuasive.

The delegation of authority theory, although perhaps appealing at first glance, fails upon a more thorough examination of the structure of the NPDES permit programs created under § 402. Subsection (a) [13] of § 402 places with the Administrator the initial authority for administering the permit program under NPDES, but further requires, during an initial transitional period, that he "*shall authorize* a State, which he determines has the capability of administering a permit program which will carry out the objective of this chapter, to issue permits for discharges into the navigable waters within the jurisdiction of such State." (Emphasis supplied.) Subsection (b) [14] of § 402 sets forth more specifically

13. Subsection (a) of FWPCA § 402, 33 U.S.C. § 1342(a) (Supp. IV), provides as follows:

(a) *Permits for discharge of pollutants.*

(1) Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

(2) The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

(3) The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

(4) All permits for discharges into the navigable waters issued pursuant to section 407 of this title, shall be deemed to be permits issued under this title, and permits issued under this title shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

(5) No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objective of this chapter, to issue permits for discharges into the navigable waters within the jurisdiction of such State. The Administrator may exercise the authority granted him by the preceding sentence only during the period which begins on October 18, 1972, and ends either on the ninetieth day after the date of the first promulgation of guidelines required by section 1314(h)(2) of this title, or the date of approval by the Administrator of a permit program for such State under subsection (b) of this section, whichever date first occurs, and no such authorization to a State shall extend beyond the last day of such period. Each such permit shall be subject to such conditions as the Administrator determines are necessary to carry out the provisions of this chapter. No such permit shall issue if the Administrator objects to such issuance.

14. Subsection (b) of FWPCA § 402, 33 U.S.C. § 1342(b) (Supp. IV), provides as follows:

(b) *State permit programs.*

At any time after the promulgation of the guidelines required by subsection (h)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case

the procedures and requirements which a State program must meet in order to qualify for that subsection's directive that the "Administrator *shall approve*" such a State's application to administer its own more permanent permit program. (Emphasis supplied.) Finally, subsection (c)[15] of § 402 directs that the federal permit issuing

may be, provide adequate authority to carry out the described program. The Administrator shall approve each such submitted program unless he determines that adequate authority does not exist:

(1) To issue permits which—

(A) apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

(B) are for fixed terms not exceeding five years; and

(C) can be terminated or modified for cause including, but not limited to, the following:

(i) violation of any condition of the permit;

(ii) obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

(iii) change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

(D) control the disposal of pollutants into wells;

(2)(A) To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title, or

(B) To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;

(3) To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

(4) To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

(5) To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

(6) To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

(7) To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

(8) To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

(9) To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.

**15.** Subsection (c) of FWPCA § 402, 33 U.S.C. § 1342(c) (Supp. IV), provides as follows:

(c) *Suspension of federal program upon submission of State program; withdrawal of approval of State program.*

(1) Not later than ninety days after the date on which a State has submitted a program (or revision thereof) pursuant to subsection (b) of this section, the Administrator shall suspend the issuance of permits under subsection (a) of this section as to those navigable waters subject to such program unless he determines that the State permit program does not meet the requirements of subsection (b) of this section or does not conform to the guidelines issued under section 1314(h)(2) of this title. If the Administrator so determines, he shall notify the State of any revisions or modifications necessary to conform to such requirements or guidelines.

(2) Any State permit program under this section shall at all times be in accordance with this section and guidelines promulgated pursuant to section 1314(h)(2) of this title.

(3) Whenever the Administrator determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw

program shall be suspended in such States where a valid State program continues to operate. Such a system for the mandatory approval of a conforming State program and the consequent suspension of the federal program creates a separate and independent State authority to administer the NPDES pollution controls, in keeping with the stated Congressional purpose "to recognize, preserve, and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution. . . ." FWPCA § 101(b).[16] Congress has not created a discretionary power in the Administrator to delegate his own authority to States with sufficient programs; it has clearly directed that the States are to administer the permit system if the Administrator determines that applying States have sufficient programs. Moreover, the Administrator's determination that a State program does or does not meet the statutory criteria for approval is reviewable in the appropriate Court of Appeals. FWPCA § 509(b)(1)(D).[17]

According to the initial comments of the Senate Committee on Public Works, which favorably reported out original Senate Bill No. 2770:

> The legislation will restore Federal-State balance to the permit system. Talents and capacities of those States whose own programs are superior are to be called upon to administer the permit system within their boundaries. The Administrator is to suspend his activity, insofar as the permit system is concerned, in these States.

Senate Report No. 92–414, in 2 Legislative History of the Water Pollution Control Act Amendments of 1972 (compiled for the Senate Comm. on Public Works by the Library of Congress), Ser. No. 93–1, p. 1426 (1973) (hereinafter "Leg.Hist.") U.S.Code Cong. & Admin.News 1972, pp. 3668, 3675.[18]

At various places in the original Senate Report, there is mention of the concept of the Administrator's "delegation" to the States. Those references, apparently made in passing, however, do not measure up well to more specific statements to the contrary made later in the House Report accompanying its amendments to the Senate Bill. House Report No. 92–911, 1 Leg.Hist. 753, 814, in which the amendments were construed, makes clear that each State's action would be its own:

> [S]ince permits granted by States under section 402 are not Federal permits—but State permits—the certification procedures [required by section 401] are not applicable.

Finally, in recommending adoption of the House amendments, with further minor modification, the Senate Conference Report described the dual permit programs contemplated by those amendments as follows:

> Provision is made for a *State to administer its own permit program in lieu of the Administrator's program,* and the Administrator is required to approve a submitted State program unless he finds that there is not adequate authority to issue the permits in accordance with the requirements of this Act. [emphasis supplied]

Senate Conference Report No. 92–1236, 1 Leg.Hist. 322, U.S.Code Cong. & Admin. News 1972, p. 3816. It is quite clear from the committee reports that Congress intended that the States' programs were to be their own and that it was fully aware of the

---

16. 33 U.S.C. § 1251(b) (Supp. IV).

17. 33 U.S.C. § 1369(b)(1)(D) (Supp. IV).

18. The Conference Report recognized that the original Senate bill provided for only a permissive delegation of authority to the States during the initial interim period prior to the Administrator's promulgation of effluent guidelines and standards. Senate Conference Rep. No. 92–1236, 1 Leg.Hist. 321–23. The House amendments to the Senate bill, which were ultimately adopted with some further amendments in § 402, provided for mandatory authorization of State programs during that interim period. *Id.*

approval of such program. The Administrator shall not withdraw approval of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

difference between States' and Administrator's permits.

■ To be sure, the FWPCA manifests a Congressional desire that minimum federal effluent standards and limitations be established and uniformly applied throughout the country. Indeed, one of the motivating forces behind the enactment of FWPCA was the fact that prior attempts at control of water pollution had resulted in confusion between State and federal roles and in the ineffective and uneven application of standards among the several States. *EPA v. State Water Resources Control Board*, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). It does not necessarily follow from that concern, however, that federal involvement, either administrative or judicial, at every stage of the remedial effort is the only manner by which minimum standards can be attained. Minimum standards are attained in the FWPCA by the Administrator's promulgation of such standards (which the State programs must honor), by his approval of those programs and by his power to review [19] both the performance of the programs and individual applications for State NPDES permits.

■ By the contemplation of minimum federal standards, however, Congress did not intend to relegate the States to the status of enforcement agents for the executive branch of the federal government. To the contrary, it is indisputable that Congress specifically declined to attempt a preemption of the field in the area of water pollution legislation, and as much as invited the States to enact requirements more stringent than the federal standards. FWPCA § 510; [20] *EPA v. State Water Resources Control Board, supra*, 426 U.S. at 218, 96 S.Ct. at 2031; *See also Metropolitan San. Dist. v. United States Steel Corp.*, 30 Ill.App.3d 360, 332 N.E.2d 426 (1975); *State v. Republic Steel Corporation*,38 Ohio Misc. 43, 311 N.E.2d 911 (Mun.Ct.1973). A State that has enacted more stringent standards thus could, and presumably would, without violating the FWPCA, issue NPDES permits containing those more stringent requirements. To conclude that a State's issuance of such an NPDES permit is "Administrator's action" subject to direct review by this Court, would in some cases result in our being required to review issues involving only a State agency's application and interpretation of purely State law. We are loath, without more convincing and specific authority than exists here, to read into the FWPCA a Congressional desire to reach such a result, a result which would raise problems going directly to the heart of our federal system.

Petitioners' second attempt to find "Administrator's action" in the issuance of a State NPDES permit rests upon the Administrator's authority to review and, if necessary, to veto individual applications for such permits. Subsections (d), (e) and (f) [21] of

**19.** See infra pp. 907–910.

**20.** 33 U.S.C. § 1370 (Supp. IV).

**21.** FWPCA §§ 402(d), 402(e) and 402(f), 33 U.S.C. §§ 1342(d) (Supp. IV), 1342(e) (Supp. IV) and 1342(f) (Supp. IV), provide as follows:
(d) *Notification of Administrator.*
(1) Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.
(2) No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this chapter.
(3) The Administrator may, as to any permit application, waive paragraph (2) of this subsection.
(e) *Waiver of notification requirement.*
In accordance with guidelines promulgated pursuant to subsection (h)(2) of section 1314 of this title, the Administrator is authorized to waive the requirements of subsection (d) of this section at the time he approves a program pursuant to subsection (b) of this section for any category (including any class, type, or size within such category) of point sources within the State submitting such program.
(f) *Point source categories.*
The Administrator shall promulgate regulations establishing categories of point sources which he determines shall not be subject to

§ 402 set out that authority. Subsection (d) provides that each State operating an approved program shall transmit a copy of each NPDES permit application to the Administrator, that no permit shall issue if the Administrator objects within ninety days of his receipt of the application and that the Administrator may waive his objections to any permit application. Subsections (e) and (f) provide further that by issuing guidelines and regulations, the Administrator may also designate particular categories of pollution sources ("point sources") for which he will waive both his notice and veto rights.

■ In the instant case the Administrator did not, of course, reject or veto the Water Company's application, but instead, without comment, allowed DEP to make the modification now in question. In the absence of any indication that the Administrator affirmatively waived his veto power pursuant to §§ 402(e) or 402(f), it appears that he merely allowed the ninety day time period within which he must make objection under § 402(d)(2) to elapse without taking any action.[22] Petitioners contend that the Administrator's silence is reviewable "action" since it amounts to his tacit approval of the State permit. We do not agree.

Just how active a role the Administrator was expected to play in reviewing each particular State permit application is un-

clear from the statute itself. Section 402(d)(2), of course, gives the Administrator the power to review and reject any particular individual application for a State permit. Yet, seemingly in the same breath, § 402(d)(3) relieves him of any duty to do either. The review power, as taken from the words of the statute, seems to be entirely discretionary. The legislative history of § 402 confirms that view and further shows that Congress intended that the Administrator should, more often than not, take no "action" with respect to proposed State permits. The Senate Public Works Committee Report, *supra,* commenting on the original Senate bill, foresaw that a valid State program, once approved by the Administrator, should require little day by day supervision with respect to individual permit applications:

> Although the Administrator is given the authority to review any permit before it is issued by a State, the Committee expects that . . . the Administrator will withhold his review of proposed permits which are not of major significance. If the Administrator finds that a State program is inadequate to mitigate his involvement he should not approve a State program.

2 Leg.Hist. 1489, U.S.Code Cong. & Admin. News 1972, p. 3737.

The next several lines of the Senate Report[23] reflects a significant difference be-

---

the requirements of subsection (d) of this section in any State with a program approved pursuant to subsection (b) of this section. The Administrator may distinguish among classes, types, and sizes within any category of point sources.

22. The letter from the Administrator to the State of Connecticut approving its permit program contained no waiver of this category. Similarly, the Administrator has apparently not included filtration plants in his regulations waiving the NPDES permit requirements for certain categories of point sources. See 40 C.F.R. § 124.11. There is an indication, in the form of two internal Environmental Protection Agency ("EPA") memoranda, that EPA staff members reviewed the original March 10, 1975 NPDES permit, but there is nothing in the EPA file submitted as part of the record on review to indicate that EPA even considered the August 26, 1975 modification challenged here. At oral argument EPA counsel admitted that the

Administrator in fact does not object to the modification but that admission is not tantamount to an admission that the Administrator affirmatively approved the modified permit at the time it was under consideration by the State.

23. The following passage explains the Administrator's review function under the original bill (2 Leg.Hist. 1489–90, U.S.Code Cong. & Admin. News 1972, p. 3737):

> The Administrator has authority to establish, by regulation, those classes and categories of point sources for which he will not exercise permit-by-permit review in any State that has received delegated authority. Certain classes and categories involving individual discharges (such as small municipalities) may be more appropriately subject to State review. If the Administrator approves a State program he should waive his right to review such permits in the interest of efficient program management. * * * For

tween the original Senate bill and the Conference amendments finally enacted. Section 402(d)(2) of the Senate bill provided that "[n]o permit shall issue until the Administrator is satisfied that the conditions to be imposed by the State meet the requirements of this Act." Consequently, the original version of § 402 contemplated a "permit-by-permit" review by the Administrator over all categories of point sources which he did not exempt by regulation under §§ 402(e) and 402(f). Further, under the original Senate version of §§ 402(c)(2) and 402(c)(3), a State could not issue a permit without the Administrator's approval unless he specifically waived his right to object within thirty days after receiving notice of the particular permit application involved. Thus, although the Senate hoped that the Administrator would maintain a low profile vis-a-vis "insignificant" State permit applications, it would have nevertheless required his approval for each one.

The final version of §§ 402(c)(2) and 402(c)(3) changed the emphasis of the Administrator's review power dramatically. The requirement that the Administrator approve all permits was replaced with a conditional proscription that no permit shall issue if the Administrator "objects" within ninety days. This change in emphasis first appeared in the House amendments. The House Committee Report reveals the reasoning behind the change as follows:

> The Committee considered extensively the proposition that all the permits issued by the States ought to be subject to review and possible veto by the Administrator. During the Committee's hearings, the Governors and other representatives of the States, almost unanimously, stressed the need to put the maximum responsibility for the permit program in the States. They deplored the duplica-

tion and second guessing that could go on if the Administrator could veto the State decisions. The Committee believes that the States ought to have the opportunity to assume the responsibilities that they have requested. If, however, a State fails to carry out its obligations and misuses the permit program, the Administrator is fully authorized under subsection (c)(3) of this section to withdraw his approval of a State program.

> The Committee has included a provision in subsection (b) that any permit program administered by a State must insure that any other State whose waters may be affected by the issuance of a permit have an opportunity to submit written recommendations with respect to the permit application. If any part of the recommendations are not accepted by the permitting State, the affected State and the Administrator must be notified in writing of its failure to accept such recommendations together with its reasons for so doing. Subsection (d)(2) provides that no permits shall issue if the Administrator within 60 days of his notification objects to the issuance of such permits. The committee has included this procedure to protect States which might otherwise be affected by the issuance of a permit in a second State.

House Rep. No. 92-911, 1 Leg.Hist. 814. It is clear, therefore, that the bill was specifically amended to remove the Administrator's duty to engage in a "permit-by-permit" review of a State's actions with respect to individual permits. Although the Act retained the Administrator's general supervisory duty to review the performance of the State programs, Congress clearly intended his role with respect to individual State permits to be passive on the whole. That view of the Administrator's role prevailed in conference.

the remaining classes of discharge source, the Administrator retains retains authority to exercise final review and approval over the issuance of a permit by a State. The bill, in an effort to insure expeditious implementation of issuance of permit and remove any uncertainty, requires that the Administrator must notify the State within thirty days of

the receipt of any application for permit if he desires to waive authority to review and approve. If the Administrator does not so notify within the time required, he retains his authority and the State cannot issue the permit without agreement from the Administrator.

In discussing the Administrator's review function during House debate on the Conference Report, Congressman Wright, a House Manager of the bill, stated:

> If the Administrator, within 90 days of the transmittal date of a proposed permit by the State, objects in writing to the issuance of the permit . . . the proposed permit shall not issue. This means that if the State proposes to issue an unlawful permit or one which does not meet the guidelines and regulations of this act, the Administrator may stop the issuance of the permit.
>
> I must give added emphasis to this point. The managers expect the Administrator to use this authority judiciously; it is their intent that the act be administered in such a manner that the abilities of the States to control their own permit programs will be developed and strengthened. They look for and expect State and local interest, initiative, and personnel to provide a much more effective program than that which would result from control in the regional offices of the Environmental Protection Agency.

1 Leg.Hist. 262.

The instant case demonstrates that the Administrator has assumed the precise role that Congress hoped he would. The record reveals nothing to indicate that the EPA regional office exercised or attempted to exercise any "control" over DEP with respect to the DEP permit modification here. Nor does it indicate that the regional office

manifested any approval of the State action. To the contrary, although EPA was aware of the State action, the record shows that the federal agency took no action at all. Such inaction, predicated upon the statute's express design, can hardly be described as "Administrator's action . . . in issuing . . . [a] permit" within the ambit of judicial review contemplated by § 509(b)(1)(F).[24]

This is not a case where the Administrator has become inextricably involved in the issuance of the State permit. In a case similar to the one at bar, but one in which the plaintiff alleged that a State agency had merely "rubber stamped" an EPA permit recommendation, the District Court for the Northern District of California held that "the mere failure to disapprove a state administrative action cannot be deemed decision-making by a federal body." *Shell Oil Company v. Train*, 415 F.Supp. 70, 78 (N.D. Cal. 1976).[25] While we approve of that statement, we have no occasion in this case to comment upon whether or not and to what extent EPA involvement with a State in approving a State permit could rise to the level of "Administrator's action" reviewable under § 509.

Admittedly, had the Administrator exercised his right of review and rejected the Water Company's permit application, that rejection would clearly be subject to review as "Administrator's action."[26] Where the opposite is the case, however, to

---

**24.** Neither FWPCA nor its legislative history provide any clear direction to the Administrator as to when he should or should not reject any particular State permit that he finds does not conform with the guidelines and regulations under the Act. It would appear that the option to take no action, even when a permit does not conform, is committed to the Administrator's almost unfettered discretion. *See Greater New York Hospital Assoc. v. Matthews*, 536 F.2d 494 (2d Cir. 1976). Since we have concluded that the Administrator's inaction in this case is insufficient to confer jurisdiction upon this Court, we do not and cannot decide whether or not such inaction in itself was improper.

**25.** The Court of Appeals for the Ninth Circuit, in companion litigation initiated by Shell Oil

Company in that Court, sought to challenge the conditions imposed upon it in an NPDES permit issued by the State of California. *Shell Oil Company v. Train*, Dkt. No. 75–2070 (9th Cir., Sept. 22, 1975). In a brief order the Court granted the Administrator's motion to dismiss the petition for review as follows:

> [T]he petition for review is dismissed . . on the ground that the . . . decision by the California Regional Water Quality Control Board was not an act by the Administrator of the Environmental Protection Agency such as would give this Court jurisdiction under Section 509(b)(1) of the Federal Water Pollution Control Act . . . .

**26.** The Administrator has so conceded. Resp. br. p. 8.

wit, where a State alone has issued an NPDES permit, no "Administrator's action" is involved. Accordingly, since § 509 provides for review in this Court of only "Administrator's action" and since the instant permit modification was made entirely by DEP, not the Administrator, we have no jurisdiction, and the petition for review must be dismissed.